REDDICK ET UX. *v.* WILLIAMS ET UX.

[No. 265, September Term, 1970.]

*Decided February 4, 1971.*

The cause was argued before HAMMOND, C. J., and MC-
WILLIAMS, FINAN, SINGLEY and DIGGES, JJ.

*W. Edward Plitt,* with whom was *Malcolm B. Tebbs* on
the brief, for appellants.

*T. Bryan McIntire,* with whom was *J. Robert Johnson*
on the brief, for appellees.

SINGLEY, J., delivered the opinion of the Court.

In March, 1962, Mr. and Mrs. Williams purchased some
16 acres of land in Carroll County. Shortly before, and
apparently as a condition of this acquisition, there had
been conveyed to them by Guy S. Formwalt and wife, over
land owned by the Formwalts:

> "* * * a Right-of-Way, 12 feet wide, from Route
> #84 * * * extending over the existing roadway
> to a point 165 feet, more or less, from the land
> [which the Williamses later acquired] * * * for
> the purpose of ingress, egress and regress be-
> tween said Route #84 and the said land * * *."

About six months later, the Formwalts sold their prop-
erty to Mr. and Mrs. Reddick, the appellants here and
defendants below. In 1964, the Reddicks placed a gate
across the right-of-way, at a point where it enters Route
84, and at a later time, installed another gate, about half
way between Route 84 and the Williams' property. There

is an intimation that there may even have been a third gate. Williams went to see Reddick to complain about the gates, but the gates remained in place. In April of 1969 Reddick locked the front gate for three nights, but removed the lock when Williams protested. Later in that year, the Williamses sought equitable relief in the Circuit Court for Carroll County. From a decree ordering the Reddicks to remove the gates and enjoining them from obstructing the right-of-way, the Reddicks have appealed.

The rule of the Maryland cases was stated in *Bishields v. Campbell*, 200 Md. 622, 624, 91 A. 2d 922 (1952):

> "* * * we think it appropriate to state the general principle that a right of way is merely a right of passage and the owner of the land is entitled to use it for any purpose that does not unreasonably interfere with the use of the easement. Hence, it is held in this State that, in the absence of an agreement or surrounding circumstances to the contrary, the owner of the servient estate has the right to maintain gates on a right of way at the points where the way begins and terminates. *Baker v. Frick*, 45 Md. 337, 341, 24 Am. Rep. 506. Of course, if a grant, construed in connection with the surrounding circumstances, shows an intention that no gate shall be erected, such a showing of intention is controlling. It is equally true that the fact that a gate was standing at the time of a grant is a circumstance that strengthens the presumption that the parties contemplated that a gate might thereafter be maintained."

See also, *Simon Distributing Corp. v. Bay Ridge Civic Ass'n, Inc.*, 207 Md. 472, 114 A. 2d 829 (1955); 3 *Tiffany on Real Property* § 812 at 357 (3d ed. 1939); Restatement, *Property* § 486 at 3027 (1944); 3 *Powell on Real Property* § 415 at 498 (1970); 25 Am.Jur.2d *Easements and Licenses* § 23 at 434 (1966); 28 C.J.S. *Easements* § 98(1)(b) at 781 (1941).

The resolution of the problem presented by this case requires some further consideration of the testimony, in an effort to ascertain the circumstances surrounding the grant and the intention of the parties. Mr. Williams testified that he first visited the property in November of 1961. His recollection was quite clear that at that time he "opened and shut no gates," that

> "You entered from the macadam road, the Uniontown Road, you went a short distance, I would vary a guess, maybe, fifty to a hundred feet, something of that nature, you dropped down into a cut. The road through the years had made a cut down through the field."

He said that "the car would go completely down in the cut" and that "the right of way was fenced on both sides either with good fence or with fence that was in the process of falling down." On cross-examination Williams admitted that there had been a removable wire, apparently a part of an electric fence, across the right-of-way, until about 1963. He was not specific about where it was, but it is clear that it was not at the entrance from Uniontown Road (Route 84).

According to Williams, after the property had been acquired by the Reddicks, the cut was filled in, so that the land which had been separated by the cut became one pasture, used permanently as such. This occurred sometime before August, 1964, when the gate was installed at the entrance to Uniontown Road.

When asked why he objected to the gate, Williams said it was dangerous,

> "Because you have to stop out on the hard surface and it's on top of the hill and you cannot— someone coming up to the entrance cannot see what's transpiring on the other side of the hill."

and added:

> "And it lowers the value of my property. I'm

using it for its present use now.[1] I have no way of knowing if I would sell it to somebody they might want to build a house. No one [in] this day and age open[s] and shuts gates like that."

When asked how the problem might be resolved, Williams suggested that cattle guards might be installed, as Reddick had done elsewhere on his property.

Ivan Myers, a former neighbor, testified that he had been familiar with the property since 1928, and that while the right-of-way had been fenced, he recalled no gates. He said that after crops had been harvested, both sides of the right-of-way had been used as pasture for a month or two. During such periods an electric fence wire was strung across the right-of-way at each end of the pasture.

Reddick testified that in September of 1962, when he purchased the Formwalt property, there were electric fence wires strung across each end of the right-of-way, and another at some point along the right-of-way. He said he had installed gates in place of the wire, and had locked the gate on Uniontown Road after there had been thefts at his farm.

Denton Powell, another neighbor called as a witness by Reddick, confirmed the testimony regarding the electric fence wires, but conceded that they had been in place only when the fields adjacent to the right-of-way were used as pasture after crops had been harvested. The testimony of Mable S. Smith, whose husband had farmed the Formwalt place and that of W. H. Devilbiss, another neighbor, was, in each case, substantially the same.

The chancellor concluded:

"The only obstruction placed at that main entrance was an electric wire strung across the road at such times as the two fields located adjacent to Route 84 were used as pasture. This was after the crops had been harvested and only

---

1. He testified that he was growing Christmas trees.

then if what remained after the harvest was conducive to this use. The testimony indicated that the opening would be blocked for a matter of several months after harvest until frost but not every year. Since the Plaintiffs looked into and acquired their grant in November of 1961, we can safely assume that the land was not then being pastured and that there was no obstruction as alleged by Mr. Williams."

\* \* \*

"\* \* \* We cannot find that the Plaintiffs at the time of the grant contemplated that any permanent gates would be constructed to obstruct the right-of-way nor do we find that the Formwalts intended any such interference, since the tenants which they had farming for them until they sold to the Defendants followed the old practice of using an electric wire across the opening to the right-of-way only in the fall of the year after the harvest of appropriate crops. They used two gates along the right-of-way for the purpose of directing the cows into whatever field they might have chosen for pasture at that particular time. We do not find that these gates were ever used to permanently obstruct the right-of-way."

After reviewing the testimony which the chancellor had before him, we cannot say that this finding was clearly erroneous, Maryland Rule 886.

Because of the change which the Reddicks made in their use of the Formwalt farm, they found it desirable to obstruct the right-of-way on a continuing basis. The circumstances surrounding the grant of the easement make it clear that it was the intention of both the Formwalts and the Williamses that removable electric fence wires could be placed across the right-of-way for a month or two after crops were harvested. When the Reddicks determined to use their farm for year-round pasture, it was incumbent on them to devise some means of restraining

their cattle which would impose no greater interference on Mr. Williams' use of the easement. The installation of the cattle guards suggested by, and apparently acceptable to Mr. Williams, would seem to serve the purposes of both parties. The cattle would be kept in the pasture without impeding Williams' right of ingress or egress and without subjecting him to the hazards involved in opening a gate to enter or leave a public road.

*Decree affirmed, costs to be paid by appellants.*